## BURR BEGGARLY v. THE STATE.

CRIMINAL LAW. *Admissibility of confessions. Evidence.* The prisoner was arrested on the charge of murder on Sunday. It appearing to the magistrate trying the cause that the testimony was insufficient to bind the prisoner over on, he suggested to Dr. Logue that he had better take the prisoner out and talk to him, and tell him about turning State's evidence, which he did, but the prisoner denied all knowledge of the crime, and was thereupon released. On Monday he was re-arrested, and before trial was again approached by one Merritt, who held out to him, also, the benefits of a confession. He was also told of the consequences of not making a statement, and that he was strongly suspected. These persons were neither an officer, prosecutor, or any one in authority. There was some excitement against the prisoner. Upon the last trial before the committing magistrates, which took place on Tuesday, perhaps, the prisoner voluntarily, after being told that it could be taken against him, but not for him, without persuasion or threats, made a confession admitting his complicity, but charging the real crime upon others, which was taken down in writing by one of the magistrates. He made several conflicting statements, but finally said that the written one was true, and the others were false: *Held*, that under all the circumstances it was proper to admit the statement as taken down by the magistrate as evidence on the prisoner's trial in the criminal court for murder.

---

FROM WILSON.

---

Appeal from the Circuit Court. W. H. WILLIAMSON, Judge.

ATTORNEY-GENERAL HEISKELL for the State.

No counsel marked for defendant.

McFARLAND, J., delivered the opinion of the court.

The prisoner was indicted for the murder of Robt. Hamilton, and upon his trial convicted of murder in the first degree, his motion for a new trial and arrest of judgment overruled, and the judgment of death pronounced, from which he appeals to this court.

The record shows that Robert Hamilton resided in Wilson county; that on the night of the 19th March, 1875, between eight and nine o'clock, hearing some noise near his house, he went out to ascertain the cause. He did not return, and next morning his body was found some three hundred yards from the house. He came to his death from a gun-shot wound, but there was no witness who saw the party or parties who did the killing.

On Sunday Esquire Patton caused the prisoner to be arrested and brought before him for examination. He proves that after the examination had progressed for awhile, he said to Dr. Logue, "We had better turn Burr loose, as the circumstance about the hat was not sufficient, and I could not as an officer bind him over. Dr. Logue said that I had better go and talk to Burr Beggarly. Then I thought about my official position, and told Dr. Logue I could not go. I told Dr. Logue to tell him about turning State's evidence, but Burr denied having anything to do with the killing. There was a good deal of excitement during the trial, and I used all my influence to keep it down."

Dr. Logue proves that on Sunday, when the prisoner was carried before Esquire Patton, "I took Burr out and told him I wanted to talk to him about the killing of Hamilton, that it was a very great crime,

that there was a great deal of feeling about it, and that there would be great efforts made to find out the guilty ones, and if he knew anything that would lead to the detection of any one concerned in it, or any one that was guilty, I thought it would be best for him to tell all about it, and I told him that there was some suspicion resting upon him upon the ground that a sack and a hat had been found there, and if he was not guilty himself, and if the guilty one could be found it would acquit him in the opinion of the people of the community, but if there was no other person found who was likely to be concerned in the killing, or guilty, that the suspicions would still rest on him, and that considerable efforts would be made to find out the person who killed Hamilton. I told Burr I thought it would be best for him to tell all about it if he knew anything. I distinctly remember telling him the above statement in substance. In the following I am not so positive. I think I told Burr if no other persons were found out that were guilty, or concerned in the killing of Hamilton, and that if the suspicion should get very strong upon him, that he was in danger of being shot down, and that if he was guilty, or concerned in it, and would tell it to others, or would make any confession leading to the detection of the guilty ones, that it was probable that it would not be so hard with him, or something to that effect. Burr made no confession to me, but denied knowing any thing about the killing of Hamilton."

This was on Sunday, and the prisoner was then released. He was arrested again about Monday night

or Tuesday, as we infer from the record, though the time is not definitely fixed.

Burnett, a State's witness, proves that Merritt had a conversation with Burr before the trial, and told him it would be better for him to confess and tell about it, and held out to him that he might be a State's witness. This was before he made any confession. Who Merritt was, whether he had any authority over the prisoner, is not shown, nor is the time of this conversation fixed, except that it was before the trial. The trial, as we infer from the record, was on Tuesday. The precise time and circumstances under which the prisoner first made confession does not clearly appear. He made several statements during and after the trial. He made a formal statement, which was taken down in writing by one of the committing magistrates, who proves that "no threat or promise was made to him, and he made the statement voluntarily. I told Burr Beggarly he could make the statement or not, that it might be taken as evidence against him but not for him. I took the statement down in writing as near as I could. I did not tell him that any former statement that he had made could not be taken against him, or that he would be released from it." The written statement was then admitted to go to the jury.

The substance of the statement is that the prisoner and Porter Williamson, another colored man, went to Hamilton's house the night of the killing, Williamson having a shot gun; that the prisoner stood guard while Williamson went into the hen house to get chickens;

that the chickens made a noise, when Mr. Hamilton came out; that prisoner notified Williamson that Hamilton was coming, and then ran away; he heard the report of the gun; he ran as fast as he could, and was not overtaken by Williamson for a considerable distance; that he lost his hat, and that the hat found there was his; that he went on home and told his wife and mother that Hamilton had caught Porter Williamson in his hen house, and that Porter had shot at him; they asked if he killed him; he told them he did not know, but Porter said he · was within ten feet of him when he shot.

The proof shows other statements made by the prisoner, some of which were during the progress of the trial, and some the night of the same day. These statements are contradictory. In some of these statements he implicated two other persons, Robert Williamson and George Kelly; that one rode a mule and the other a horse, and that he and Porter Williamson were to make a noise so that Hamilton would run by where the other parties were, who were to shoot him. Afterward he said this statement was not true, but the written statement was true. In other statements he said it was not the shot gun of Porter Williamson that did the killing, but a short army gun, which the other proof indicates that he had in his possession, and was endeavoring to put out of the way soon after the homicide. He said wherever the sack was found that was the place the shooting was from; that he had the sack around the gun lock to keep it dry; the sack was found ten or fifteen steps from the body of

Hamilton; the hat was found near the hen house. The prisoner stated that Williamson said one barrel of his shot gun was loaded; it was loaded when it was found; the short army gun was not loaded when found, but had mud on it.

The question arising upon the foregoing statements is whether or not the confessions were properly admitted. The prisoner's counsel moved the court to withdraw all evidence of the confessions. Regrets have been expressed that the rule had ever obtained of excluding confessions upon the ground of their having been obtained by improper influences, and the doctrine maintained that they ought to be admitted, leaving their value as evidence to be determined by the jury from the circumstances under which the confessions were made. But the contrary doctrine has been so long settled, and universally followed, that it would be a bold move to overrule all the authorities upon the subject, and establish the doctrine contended for at one step.

There is no doubt, however, that in the rejection of confessions, courts have sometimes gone to extreme lengths. It remains, however, the settled rule, that while a free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, yet a confession forced from the mind by the flattery of hope or torture of fear is not to be considered as evidence, and should be rejected.

The material inquiry, therefore, is whether the confession has been obtained by the influence of hope or

fear applied by a third person to the prisoner's mind. The evidence on this point, being in its nature preliminary, is addressed to the judge, who admits the proof or rejects it, as he may or may not find it to have been drawn from the prisoner by the application of these motives. The matter is in the discretion of the judge upon all the circumstances of the case, taking into consideration the age, situation, and character of the prisoner, and the circumstances under which the confession was made. 1 Greenl. on Evidence, sec. 219.

In regard to the person by whom the inducements were offered, there has been conflict in the authorities, some holding that the inducements held out by private persons, not being prosecutor, officer, or having any authority over the prisoner, are not sufficient to exclude confessions thus obtained; but the sounder rule manifestly is, that this is a mixed question of law and fact for the judge, and while it is proper to note the difference between confessions obtained by prosecutor, officer, or person in authority, and those obtained by private persons, yet, if, in fact, the confessions were forced from the prisoner through hope or fear presented to his mind by a third person, it should be rejected. In determining this the judge should look not only to the position and character of the person offering the inducements, as well as of the prisoner, and all the attending circumstances. 1 Greenl., sec. 223.

If the confession in question had been made to Dr. Logue at the time of the conversation between him and the prisoner on Sunday, there could be no doubt that they should be rejected. We may fairly

infer that Dr. Logue was a man of character and influence; he was a physician of many years' practice; he was in conference with the magistrate in regard to the prosecution. We think no well considered case can be found where a confession obtained in this manner has been admitted. But no confession was then made. The prisoner denied his guilt. No further conversation occurred between the prisoner and Dr. Logue.

At some time between Sunday and Tuesday, when the confessions were made, the conversation between the prisoner and Merritt was had, in which Merritt told him that it would be better for him to confess and turn State's evidence. It does not appear that any confession was then made. Before the confession was made which was taken down by the magistrate, the prisoner was told by the magistrate that he could confess or not; that his statement might be used as evidence against him but not for him. Now, are we to take it that these confessions were the result of the motives of hope or fear held out to the prisoner by Logue on Sunday, and by Merritt, or were they voluntary confessions springing from a consciousness of guilt.

It is settled that where confessions are improperly obtained, another confession made soon after will be presumed to proceed from the same cause, unless it be shown that before the confession the . prisoner's mind has been disabused of the improper influences. 1 Greenl., 21.

In this case no confession was made when the inducements were held out to the prisoner. The ques-

tion is, whether the confessions were made under the influence of the previous inducements, or are we to infer that as he then made no confessions, that the inducements were not sufficient to operate upon the prisoner's mind, or that the influences were removed by the magistrate's warning. As we have seen, no confessions were made either to Logue or Merritt. No connection exists between the inducements held out and the confessions made, except that the confessions followed in a short time after the inducements to confess were offered. Yet these inducements were not sufficient at the time to procure a confession from the prisoner, and before his confession was made he was warned by the magistrate that his confessions might be used against him, but not for him, and he was then in the custody of the officer, and under the protection of the law, and we see nothing to indicate that he was then under apprehension of personal violence, or that he had reason to apprehend such danger. His statements made during the trial do not indicate that he was so intimidated as to prevent his acting freely. Of course we cannot know with absolute certainty that he was entirely free from the influences previously presented to his mind, but if such influences possibly may have been operating upon him, the jury were fully instructed and cautioned against relying upon confessions not corroborated, and we think that in such case there was but little danger of an improper conviction. From the contrary holding it would result that no confessions could be admitted when it appears that shortly previous inducements had been held out to confess by

any one which were sufficient to exclude a confession, had one been obtained.

We have carefully examined the testimony, and while the prisoner's confessions are manifestly not in all respects true, yet we are satisfied of his guilt, and that the conviction was proper. The jury were, no doubt, fully satisfied that the prisoner himself did the killing, or that he was present aiding and assenting thereto. Such parts of the prisoner's confessions as the jury have relied upon as true are fully corroborated. The murder was cruel and atrocious, and without mitigation.

Let the judgment be affirmed.